Filed 2/5/21; Opinion on transfer from Supreme Court

**CERTIFIED FOR PUBLICATION**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| JON WILMOT, | |
|      Petitioner and Appellant, | A152100 |
| v. | |
| CONTRA COSTA COUNTY EMPLOYEES' RETIREMENT ASSOCIATION et al., | (Contra Costa County Super. Ct. No. N16-1730) |
|      Defendants and Respondents, | |
| STATE OF CALIFORNIA, | |
|      Intervener. | |

A veteran county employee decided to retire, and in December 2012, he submitted his application for retirement to the county's retirement authority. On January 1, 2013, the California Public Employees' Pension Reform Act of 2013 (Pension Reform Act or PEPRA) took effect. Included in that measure is a provision that mandates the forfeiture of pension benefits/payments if a public employee is convicted of "any felony under state or federal law for conduct arising out of or in the performance of his or her official duties." (Gov. Code,[1] § 7522.72, subd. (b)(l) (section 7522.72).) In February 2013, the employee was indicted for stealing county property. In April 2013, the county pension authority approved the employee's retirement application, fixing the employee's actual retirement on the day he submitted that application in

_____

[1] Statutory references are to this code unless otherwise indicated.

December 2012. Also in April 2013, the employee began receiving monthly pension checks starting from December 2012. In December 2015, the employee pled guilty to embezzling county property over a 13-year period ending in December 2012. Thereafter, the county pension authority reduced the employee's monthly check in accordance with the forfeiture provision.

The question presented is whether the forfeiture provision applies to the employee. We conclude the provision does apply to the employee because, as a matter of statutory construction, the employee had merely initiated the process of retiring. We also conclude that even if the employee was retired, and the forfeiture provision was applied to him, there would be no violation of the California Constitution's provision against the undue impairment of the employee's contract with his governmental employer, nor would that application constitute an ex post facto law.

## BACKGROUND

The salient facts are without dispute.

Plaintiff Jon Wilmot commenced employment with the Contra Costa County Fire Protection District in 1985. By 2012, he had risen to the rank of captain. During this period, he was a member of the retirement program established by Contra Costa County in accordance with the County Employees Retirement Law of 1937 (CERL) (Stats. 1937, ch. 677, codified in 1947, § 31450 et seq.), which is administered by the Board of Retirement of the Contra Costa County Employees' Retirement Association. The association and its governing board will hereafter be designated as CCERA. By the end of 2012, Wilmot had decided to retire. His final day on the job was December 12, and he submitted his "application for a service retirement" (§§ 31663.25–31663.26) to CCERA the following day.

2

On January 1, 2013, the Pension Reform Act became effective, thus adding section 7522.72. Subdivision (a) states that it "shall apply to a public employee first employed by a public employer . . . before January 1, 2013." The relevant language is subdivisions (b)(1) and (c)(1), which originally provided in pertinent part:

"(b)(1) If a public employee is convicted by a state or federal trial court of any felony under state or federal law for conduct arising out of or in the performance of his or her official duties, in pursuit of the office or appointment, or in connection with obtaining salary, disability retirement, service retirement, or other benefits, he or she shall forfeit all accrued rights and benefits in any public retirement system in which he or she is a member to the extent provided in subdivision (c) and shall not accrue further benefits in that public retirement system, effective on the date of the conviction. [¶] . . . [¶]

"(c)(1) A public employee shall forfeit all the retirement benefits earned or accrued from the earliest date of the commission of any felony described in subdivision (b) to the forfeiture date, inclusive. The retirement benefits shall remain forfeited notwithstanding any reduction in sentence or expungement of the conviction following the date of the public employee's conviction. Retirement benefits attributable to service performed prior to the date of the first commission of the felony for which the public employee was convicted shall not be forfeited as a result of this section." (Stats. 2012, ch. 296, § 15.2.)[2]

---

[2] Two 2013 amendments made the language nongender-specific (Stats. 2013, ch. 528, § 76) and expanded the scope of subdivision (c)(l) in two ways: (1) it henceforth would apply to "rights" as well as benefits, and (2) it substituted "member" for "public employee" (Stats. 2013, ch. 528, § 13). "Member" is a broader term that includes retirees. (See, e.g., §§ 20164, 20230, 20281, 20370, 20371.) We have previously said: "In plain English, and excluding

3

On March 19, 2013, CCERA received Wilmot's "Choice of Retirement Allowance." The following month CCERA formally approved Wilmot's retirement application, fixing his date of retirement as December 13, 2012, and sent him his first monthly pension check for $8,758.46.

But Nemesis was already on her way.

At some point not established by the record, authorities learned that Wilmot had, for a considerable part of his tenure, been stealing property and equipment from the Contra Costa County Fire Protection District.[3] In February 2013, the District Attorney filed four felony charges. In December 2015, Wilmot entered a plea of no contest to a single charge that was alleged in the information as follows:

"The District Attorney of the County of Contra Costa hereby further accuses JON WILMOT, Defendant, of the crime of felony, a violation of PENAL CODE SECTION 503/508 (EMBEZZLEMENT BY CLERK, AGENT, OR SERVANT), committed as follows: On or about January 1, 2000 through

survivor beneficiaries, a 'member' is a past or present 'employee' (§ 31469) of a 'public agency' (§ 31478) who did or is rendering 'public service' for compensation to that public agency (§ 31479)." (*Marin Assn. of Public Employees v. Marin County Employees' Retirement Assn.* (2016) 2 Cal.App.5th 674, 683, fn. 4, review granted Nov. 22, 2016, S237460, review dismissed Sept. 23, 2020 (*Marin County*).)

[3] Wilmot was subsequently ordered to pay almost $33,000 to the district as criminal restitution. Included in the materials submitted to CCERA in connection with reducing Wilmot's monthly pension check was a two-page inventory of the "CCCFPD Property Recovered from Wilmot Truck Date: 12/12/12," together with an 11-page undated inventory of "Property Recovered from Houses." Among the hundreds of items listed were hand tools, clothing, blankets, chainsaws, binoculars, dozens of boxes of batteries, lightbulbs, bars of soap, toilet paper, and United States and California state flags. The alert reader will note that at least one of these "recoveries" occurred the day before Wilmot submitted his retirement application.

December 31, 2012, at Alamo, Orinda and Concord, in Contra Costa County, the Defendant, JON WILMOT, did willfully, unlawfully and fraudulently appropriate property from Contra Costa Fire Protection District."

Upon learning of Wilmot's conviction, CCERA advised him: "In accordance with the . . . Pension Reform Act . . . , [CCERA] is required to make adjustments to your member account." Wilmot was informed that, by reason of his conviction, "Section 7522.72 therefore requires that you forfeit all rights and benefits accrued from January 1, 2000, the date of the first commission of the felony." The specified consequences were: (1) "Service credit from January 1, 2000 through December 13, 2012, totaling 13 years and 0 months, has been expunged"; (2) $249,937.64 of Wilmot's total "employee contributions" of $288,857.74 would be refunded; and (3) these changes to his "Final Average Compensation Adjustment" would reduce Wilmot's monthly check from $8,758.61 to $2,858.56.

These changes were adopted in August 2016, following a contested public hearing. Wilmot was advised by letter that "the [CCERA] Board of Retirement" "determined pursuant to . . . Section 7522.72 to adjust your retirement allowance effective September 1, 2016."[4]

The next month Wilmot commenced this action with a petition for a writ of traditional mandate and declaratory relief. The basis of Wilmot's position—in the trial and on appeal—was succinctly stated in his petition: "Respondents' application of the felony forfeiture provision appearing in . . . section 7522.72 to Petitioner is improper because the statute does not apply

---

[4] It appears that Wilmot was also receiving benefits from CalPERS for a period of service with a different public employer. After CCERA informed CalPERS of its action, CalPERS followed and "amended" Wilmot's "retirement benefit" downward. The decision by CalPERS has never been at issue in this litigation.

5

retroactively to persons such as Petitioner who retired prior to its effective date. Moreover, even if . . . section 7522.72 was intended to apply retroactively to persons who retired prior to its effective date, the statute cannot lawfully do so because Petitioner's pension benefit became due and payable upon his retirement and the Legislature cannot lawfully alter an existing retiree's pension benefit once the benefit came due and payable. The Legislature also lacks authority to enhance the punishment for past conduct by enacting an ex post facto law. By applying . . . section 7522.72's forfeiture provision to Petitioner, Respondents ignored the terms of the statute itself, unlawfully impaired Petitioner's constitutionally protected pension benefits, and violated Petitioner's constitutional right to be free from an ex post facto application of the law." The State of California was allowed to intervene to defend the constitutionality of section 7522.72.

Following extensive briefing and argument, the trial court (Hon. Charles Treat) denied the petition with a thoughtful order that, with minor, nonsubstantive modifications, merits quotation at length:

"Wilmot asserts a number of interconnected arguments why the Board's determination is incorrect, and he cannot be subjected to PEPRA's forfeiture provisions. First, he argues that he is not a 'public employee,' or 'member' subject to § 7522.72. It is undisputed that § 7522.72 did not come into effect until January 1, 2013. As of that date (Wilmot argues), he was no longer a 'public employee,' because he had retired effective the preceding December 13. That, he reasons, made him a retiree, not a 'public employee' (and hence also not a 'member.') Accordingly, by its own textual definition of its coverage, § 7522.72 does not apply to him, and does not authorize or work any forfeiture of his pension rights.

6

"Wilmot's following arguments are variations on the same theme. His second argument is that if § 7522.72 could be read as applying to a person who had retired before 2013, it would be at best ambiguous in that respect. Thus, he invokes the principle of refusing to read a statute to apply retroactively-meaning, as Wilmot uses the term, as applicable to a person already retired as of the effective date of the statute. Third, he argues that if the statute did dictate a forfeiture as to pension rights that had accrued prior to the statute's enactment, it would represent an unconstitutional interference with vested pension rights already in existence on the statute's first effective date.

"Wilmot's arguments potentially raise a number of textual and logical difficulties. The Court need not decide all these difficulties, however, because all of Wilmot's arguments (except his *ex post facto* argument, discussed below) all fail at their critical initial premise. All of the above arguments assume that as of January 1, 2013, Wilmot was already formally retired. It is from this premise that he argues (1) that as of that date he was not a 'public employee' or 'member,' ( 2) that application of the statute to him would be retroactive, and (3) that his pension rights were constitutionally vested. If, to the contrary, Wilmot was not yet retired but still employed as of January 1, 2013, the preceding arguments all fall apart. It was for this reason that the Court called for supplemental briefing as to whether [Wilmot] was 'retired' on December 13, 2012, the date he selected as his retirement date, or on April 10, 2013, the date the [CCERA] Board acted on [Wilmot's] application.

"In his supplemental brief, Wilmot argues: [¶] 'Under [CERL], a member who has provided the qualifying number of years of service and has attained the required age is "retired" upon filing with the board a written application setting forth the date upon which the member desires his or her

7

retirement to become effective . . . .' (. . . §§ 31672(a), 31663.25(a), 31663.26(a) . . . .) Thus, a qualifying member is 'retired' as of the effective date identified on the submitted application. [*CERL*] *grants the member— not the retirement board or the employer—the right to select their own date of "retirement" . . . .'* [¶] . . . [¶]

"But these Government Code provisions do not say that the member is *retired* upon his application. They say that he *may be retired*. (See . . . § 31672(a) ['A member . . . *may be retired* upon filing with the board a written application . . . .']; § 31663.25(a) ['Except as provided in Section 31663.26, a safety member[5] . . . *may be retired* upon filing with the board a written application . . . .']; § 31663.26 ['Notwithstanding Section 31663.25, a safety member . . . *may be retired* upon filing with the board a written application . . . .'] [emphasis added].) Wilmot selectively quotes around the actual verb.

"The entity that retires the member is the Board. (See . . . § 316.70 ('Retirement of a member who has met the requirements for age and service *shall be made by the board* pursuant to this article . . . ') (emphasis added). Wilmot argues that this is a mere ministerial act. But no matter how ministerial that act may be, in that the Board merely confirms [Wilmot's] age and service, under the plain statutory language retirement cannot occur until the Board so acts. Moreover, while the formal act of retirement is no doubt more or less ministerial in most cases, it may not always be so. For example, suppose that Wilmot's embezzlement conviction had occurred in March 2013, rather than December 2015.

---

5   A "safety member" is defined in CERL as "[a]ny person employed by a county . . . whose principal duties consist of active law enforcement or active fire suppression . . .or active lifeguard serviced . . . or a juvenile hall group counseling and group supervision . . . ." (§ 31469.3, subd. (b).)

8

"In that case, at the time the Board acted on Wilmot's retirement, it would have been obligated to assess whether Wilmot's conviction subjected him to the forfeiture provisions of § 7522.72, and to carry out those provisions if applicable. That is not the actual timing of this case-but it points out why the official date of the Board's action matters, and why a member cannot be deemed formally retired until the Board does act. Here, that did not occur until after January 1, 2013.

"The only case law that any party has cited as closely on point is *MacIntyre v. Retirement Board of S.F.* (1941) 42 Cal.App.2d 734 *(MacIntyre).* There, two police officers filed applications for retirement. After the first application (but before the second), a verified complaint was filed, charging both officers with various forms of misconduct. The charges resulted in the officers' dismissals, and the denial of pension rights to them. The court rejected their argument that their pension rights had vested when they met the requisites for retirement—age, years of service, and contribution—so that their pension rights could not be denied due to any subsequent determinations. And more specifically, the court rejected the argument that either officer was already retired by the time of his dismissal, because of the filing of their applications for retirement. 'The filing of an application does not *ipso facto* retire the applicant. It is necessary that an order of retirement be duly made.' *(Id.* at 736.) *MacIntyre* is not directly controlling here, as the city and officers there were operating under different applicable statutes (and the decision does not delve into the statutory language). The case illustrates, however, that where the relevant statutory language dictates that 'retirement' occurs upon board action and not simply upon the filing of an application, that formality must be taken seriously.

9

"Accordingly, even assuming *arguendo* that § 7522.72 applies only to persons who were not yet retired as of January 1, 2013, the undisputed facts here show that Wilmot himself was not yet formally retired as of that date. The act that (by Wilmot's logic) transformed him from a 'public employee' and 'member' into a retiree/former employee was not his selection of December 13, 2012, as the effective date of his retirement, but the Board's approval of that retirement on April 10, 2013.

"That leaves Wilmot's *ex post facto* argument, which is not dependent on the timing of his retirement. Rather, the contention looks only to the dates of the commission of Wilmot's crime (2000 to 2012) and the date of the effectiveness of PEPRA ([January l,] 2013). The argument is that a crime, committed no later than 2012, is being penalized by a forfeiture statute enacted only after the crime had been committed and completed.

"On its face, § 7522.72 is a civil statute, not subject to the prohibition on *ex post facto* laws. See Cal. Const. art. 1, § 9; *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 180 ('The ex post facto clauses [of the U.S. and California Constitutions] apply only to penal statutes.') The State concedes that civil penalties can in some cases violate the ex post facto clause if the punishment amounts to a criminal proceeding. (See *People v. 25651 Minoa Dr.* (1992) 2 Cal.App.4th 787, 796–797.) But the test for such a finding is two-fold and not in Wilmot's favor: 1) Did the state intend to establish a criminal or civil penalty? and 2) If the intent was a civil penalty, was the statutory scheme so punitive in purpose or effect as to negate that intention? (See *United States v. One Assortment of 89 Firearms* (1984) 465 U.S. 354, 362.)

"The Court is satisfied that there is no *ex post facto* violation here. Wilmot concedes that the Legislature intended to enact a civil penalty, not a

10

criminal one.  The statutory scheme is not so punitive as to negate that intention.  PEPRA's forfeiture  provisions do not function to impose a punitive fine on Wilmot, let alone to subject him to imprisonment or the like.  Rather, what PEPRA accomplishes is to take back from Wilmot what he never rightfully earned in the first place-namely pension rights for a period when he was violating his trust as an employee by embezzling from his employer.  (See also *MacIntyre, supra,* 42 Cal.App.2d at pp. 735–736.)

"This ruling makes it unnecessary to rule on objections to the parties' respective requests for judicial notice.  The proffered documents are adduced only as bearing on the proper construction of § 7522.72, in particular as to whether it does or does not apply to a person who was already retired as of the end of 2012.  That is the question that the Court has declined to decide, because it turns out that Wilmot himself was not retired as of the end of 2012.  For the sake of completeness, however, the Court will sustain the Board's and State's objections.  There is no sufficient foundation that the documents objected to represented a considered, official, and final position from the agencies they came from—let alone any indication that they have anything to do with the intention of the Legislature when it enacted (§ 7522.72.)  Moreover, the CALPERS documents do not purport to say anything one way or the other as to the question at issue here—the applicability of PEPRA's felony forfeiture provisions to pre-enactment retirees."

## DISCUSSION

When we first decided the appeal, we had already decided in *Marin County* that application of PEPRA to serving county employees did not substantially impair their contracts of employment, an action forbidden by the federal and state constitutions.  (U.S. Const., art. I, § 10; Cal. Const.,

art. I, § 9.) The California Supreme Court used a slightly different analysis to come to the same conclusion. (*Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.* (2020) 9 Cal.5th 1032 (*Alameda County*).) It then transferred Wilmot back to us with directions to vacate our prior decision and reconsider the cause in light of the Supreme Court's opinion. The order ended with the following: "In doing so, the court is directed to address and resolve petitioner's claim under the contract clause of the California Constitution."

In *Marin County* we addressed one specific change in the Pension Reform Act, namely, the Legislature's goal of curbing the perceived abuse of "pension spiking." It is another perceived abuse at issue here—the first statewide adoption of what is known as a "pension forfeiture" provision (see generally Jacobs, Friel, O'Callaghan, *Pension Forfeiture: A Problematic Sanction for Public Corruption* (1997) 35 Am.Crim.L.Rev. 57 (*Pension Forfeiture*)) to public employees. Such measures were an early feature of municipal pension schemes, and the general principle that pension rights could be lost by criminal behavior had been judicially ratified by California courts.[6] However, there was a generally assumed qualification: crimes committed after retirement were excluded. (See, e.g., *Wallace v. City of Fresno* (1954) 42 Cal.2d 180 (*Wallace*); *Lawrence v. City of Los Angeles* (1942) 53 Cal.App.2d 6; *MacIntyre, supra*, 42 Cal.App.2d 734.)

---

[6] The United States has had such a provision since 1954. (See *Hiss v. Hampton* (D.D.C. (1972) 338 F.Supp. 1141, 1142, fn. 1.) In the private sector, "employee pensions that have vested (i.e., the employee has satisfied the statutory age and/or years-of-service requirements) are protected from forfeiture for misconduct under the anti-alienation and anti-forfeiture provisions of ERISA . . . as interpreted by the United States Supreme Court in *Guidry v. Sheet Metal Workers Nat'l Pension Fund* [(1990) 493 U.S. 365]." (*Pension Forfeiture, supra,* 35 Am.Crim.L.Rev. 57, 58–59.)

In 2005, in the wake of several notorious incidents of financial corruption and mismanagement, the Legislature passed a measure allowing for the limited forfeiture of pension benefits for "any elected public officer who takes public office, or is reelected to public office, on or after January 1, 2006" upon conviction of a specified crime. (Stats. 2005, ch. 322 [adding former § 1243, which was re-enacted as § 7522.70]; see Little Hoover Com., Public Pensions for Retirement Security (Feb. 2011) p. 39.)[7] Following the recommendations of the Little Hoover Commission and Governor Brown, the Legislature expanded the principal to public employees. (Little Hoover Com., Public Pensions for Retirement Security (Feb. 2011) p. 39; "Governor Brown Releases Twelve-Point Pension Reform Plan," March 31, 2011, https://www.ca.gov/archive/gov39/2011 [as of Dec. 14, 2020].) Section 7522.72 applies to "a public employee first employed by a public employer . . . before January 1, 2013." Section 7522.74 applies to those persons whose employment commenced "on or after January 1, 2013."

As pension forfeiture provisions go, California's is rather temperate. (See generally, Annot., Misconduct as Affecting Right to Pension or Retention of Position in Retirement System (1961) 76 A.L.R.2d 566; cf. *Corvelli v. Board of Trustees* (N.J. 1992) 617 A.2d 1189 [conviction for theft of police shotgun

---

[7] The Legislature had already provided that "Any person who is receiving an allowance from a public retirement system, who is charged by indictment or complaint, either in a court of this state or a federal court whose jurisdiction encompasses all or any portion of the state, with the commission of any felony involving or accepting or giving, or offering to give, any bribe, the embezzlement of public money, extortion or theft of public money, perjury, or conspiracy to commit any of those crimes arising directly out of his or her official duties as a public officer, who has a legal obligation not to leave the jurisdiction of the court, but does leave, shall have his or her retirement allowance suspended while absent the jurisdiction of the court." (§ 1235, subd. (a), added by Stats. 1994, ch. 991, § 2.)

supported forfeiture of all pension benefits after 30 years of service]; *Woods v. City of Lawton* (Okla. 1992) 845 P.2d 880 [employee with 29 years' service lost all pension rights following conviction for defrauding employer].)  It is not triggered by just any conviction, or even any felony conviction, but only a felony conviction that is job-related.[8]  Pension benefits are not lost entirely, but only for the period of the felonious behavior.[9]  The employee's contributions for that period are not kept, but are returned.  (§ 7522.72, subd. (d)(1).)  And if the conviction is reversed, the employee may redeposit her contributions and "[r]ecover the forfeited rights and benefits." *(Id.,* subd. (h).)

**Statutory Analysis**

Wilmot asserts in effect there is but a single legal error, namely, after December 13, 2012, he was retired, no longer an active, working public employee, and therefore beyond the reach of section 7522.72.

This case is a perfect example of how a word can have an everyday meaning and a very different legal definition.  Most people would ordinarily think if a person who has worked at the same job for 30 years or so, submits the appropriate paperwork for retirement and completes the last day of work, then that person can legitimately think of himself as retired.  However, for public employees in California, particularly employees covered by CERL, retirement is hardly that simple.

---

[8]   By way of contrast, a judge will forfeit pension benefits if convicted of a felony "while holding judicial office . . . and which either involves moral turpitude . . . or was committed in the course performing the judge's duties[.]" (§ 75526, added by Stats. 1994, ch. 879, § 11.)

[9]   Unless the job-related felony involves offenses committed against children, in which case the public employee "shall forfeit *all* accrued rights and benefit in *any* public retirement system." (§ 7522.72, subd. (b)(2), italics added.)

Judge Treat's ruling was quoted almost in full because it addresses two of the three points raised here—and because it is correct. Finishing the last day of work does not automatically make a public employee a "retired" former employee. Submitting your application for pension benefits does not make you retired for purposes of CERL. We only briefly augment Judge Treat's reasoning.

Wilmot attacks that reasoning as "fundamentally flawed" because Judge Treat "failed to appreciate the distinction between an individual's employment status and their retirement status." In his words, these are "separate and distinct conditions" "acknowledged by Section 7522.72 itself." However, resort to the language of a single provision may be deceptive and misleading. It also goes against the sensible principle cautioning courts that they should not " ' "construe statutes in isolation, but rather read every statute 'with reference to the entire scheme of law of which it is a part so that the whole may be harmonized and retain effectiveness.' " ' " *(People v. Valencia* (2017) 3 Cal.5th 347, 384.) Given that we are dealing with an extensive statutory scheme of almost fiendish complexity, it is appropriate to take this canon of statutory construction to heart, particularly because section 7522.72 is not even in CERL (which commences with section 31450 and concludes with section 31898, and which occupies the better part of two volumes of West's Annotated California Codes).

At first glance, Wilmot's distinction between "employment status" and "retirement status" has a natural attraction because it accords with the common understanding of what retirement means. It might also appear that CCERA unwittingly bolstered Wilmot's position by dating his retirement to December 13, 2012, and, eventually, paying him pension benefits from that date. Thus, Wilmot can in effect say: "See, even CCERA accepts that I

15

retired on December 13th." Wilmot's reasoning is sound, but only conditionally so, being subject to the proviso identified by Judge Treat.

The person who has stopped working naturally would no longer think of herself as being a public employee, but as a former public employee, a *retired* public employee. But this is a false dichotomy. The issue is not how such a person characterizes herself, but how CERL does.

Submitting retirement papers to the county retirement agency is only the start of the retirement process under CERL. The application is then reviewed, and, if correct in form, sent to the county retirement board for its approval. The need for this hiatus is obvious. It allows for a change of mind by the employee. The retirement board has to verify the employee's history. *(Flethez v. San Bernardino County Employees Retirement Assn.* (2017) 2 Cal.5th 630, 636 ["a county retirement board . . . must 'investigate[] applications and pay[] benefits only to those members who are eligible for them' "]; cf. § 31541, subd. (a ) [retirement board may "correct the errors or omissions of any active or retired member"].) The employee's "compensation earnable" and "final compensation" (see §§ 31461, 31462, 31462.05, 31462.2) must be computed. Whether the employee has a "prior service pension" (see §§ 31664, 31664.1, 31664.2, 31676, 31677) with another employer, or was employed as a safety member by a different agency (§§ 31664.5, 31672.5), may also have to be considered. Depending on the agency involved, there may be a policy requiring that the employee's vacation or leave time be exhausted (if only for accounting purposes) before a replacement may be hired.[10] (Cf. § 21163 ["the retirement of a [CalPERS] member who . . . is

---

[10] This may be especially true if the employee is seeking disability retirement. (See *Katosh v. Sonoma County Employees' Retirement Assn.* (2008 ) 163 Cal.App.4th 56 [employee's disability retirement effective when accrued sick leave exhausted].)

entitled to sick leave . . . shall not become effective until the expiration of the sick leave"].)  The retirement board would also be " 'required to determine whether items of remuneration paid to employees qualify as "compensation" under section 31460 and "compensation earnable" under section 31461, and therefore must be included as part of a retiring employee's "final compensation" (§ 31462 or § 31462.1) for purposes of calculating the amount of a pension.' " *(Marin County, supra,* 2 Cal.App.5th 674, 680, quoting *In re Retirement Cases* (2003) 110 Cal.App.4th 426, 433.)  There may be other factors reflected in the memorandum of understanding negotiated between public agencies and employees under the Meyers-Milias-Brown Act (§ 3500 et seq.), which often address points relevant to compensation and pensions and might therefore have to be consulted.  All this takes time.

Judge Treat cited a number of statutes establishing that the employee's application is merely pending until approved by a retirement board.  Other statutes are more emphatic, leaving no doubt that the decisive retirement event is that approval.  (See § 31497.3, subd. ( a) ["Retirement of a member . . . who has met the requirements for age and service shall be made by the board, *at which time the member . . . becomes a retired member,"* italics added], § 31499.4, subd. (a) [same], § 31511.4, subd. (a) [same], § 31486.4, subd. (a) ["Retirement of a member or former member who has met the requirements for age and service shall be made by the board, *at which time the member or former member becomes a retired member,"* italics added],§ 31491, subd. (a) [same], § 31499.14, subd. (a) [same].)  Wilmot is simply wrong in stating *"No CERL provision states that retirement occurs 'upon board action.' "*  We believe our Supreme Court would agree.  (See *Flethez v. San Bernardino County Employees Retirement Assn. supra,* 2 Cal.5th 630, 643 ["SBCERA argues that county employees have only an

17

inchoate right to a disability retirement pension, which vests only when the last contingency to the pension is removed.  Specifically, SBCERA asserts that under CERL, the right to a disability retirement . . . is not vested until *the retirement board to which an application is submitted has reviewed the submitted evidence and finally acts on the application . . . .*  [¶]  SBCERA has the better argument," italics added].)

True, there are statutes with language that a vested employee "may be retired upon filing with the board a written application" (e.g., §§ 31491, subds. (c), (d); 31497.3, subds. (c), (d), 31499.4, subds.(c), (d)), but the same statutes also specify that the decisive act is approval of that application by the board:  "Retirement of a member . . . shall be made by the board, *at which time the member or former member becomes a retired member.*"  (§ 31491, subd. (a), italics added, § 31497.3, subd. (a), § 31499.4, subd. (a).)  Wilmot attacks as "incorrect[]" and a "misconstru[ction]" Judge Treat's conclusion that it was CCERA's approval of his retirement application that "transformed him from a 'public employee' and 'member' into a retiree/former employee."  The verb may not fit perfectly, but it does capture the essence of the process.

Wilmot notes that "[t]he distinction between an individual's employment status and retirement status makes sense."  It is but a truism to say that employment and retirement are different things.  It does not follow that CCERA was, in Wilmot's characterization, "dictat[ing]" his status.  CCERA was merely following established procedures, admittedly one with a new wrinkle.  If there was any dictating, it was done by CERL—and the Legislature.  Indeed, by insisting that he "was in fact retired" when he submitted his retirement application, it is Wilmot who is doing the dictating by deciding which parts of CERL apply to him.

18

Wilmot asserts that *MacIntyre* involved a municipal charter pension system, and thus does not give guidance to how CERL should be construed. We do not agree. As already shown, the municipal pension system in *MacIntyre* operates in much the same manner as does CERL. The excerpt from *MacIntyre* quoted by Judge Treat—"The filing of the [pension] application does not *ipso facto* retire the applicant. It is necessary that an order of retirement be duly made" (*MacIntyre, supra,* 42 Cal.App.2d 734, 736)—is a spot-on description of how CERL operates. If anything, section 7522.72 is more measured than the San Francisco provision, for there the police officers committed only "conduct unbecoming an officer, disobedience of orders and insubordination." (*MacIntyre,* at p. 735) Wilmot was convicted by his own admission of long-term felonious thievery from his employer. And, unlike the dismissed officers in *MacIntyre,* Wilmot was not stripped of all pension benefits.

Wilmot is simply mistaken when stating "the Supreme Court has made it clear that, in accordance with a retirement system's relevant governing provisions, an employee is entitled to a pension *at the moment the employee has submitted an application for it* after attaining the minimum age and completing the prescribed period of service." (Italics added.) He points to no decision with such a holding. Neither the language of section 7522.72 in particular, nor CERL in general, lends the slightest support to the idea that a corrupt public employee, knowing that law enforcement is closing in, has only to throw his retirement application in a mailbox to make accrued pension benefits untouchable. (Cf. *Kerner v. State Emp. Retirement System* (Ill. 1978) 382 N.E.2d 243, 246 ["under plaintiff's theory, an employee need only retire prior to his language of to throw his retirement application in a mailbox to make accrued pension benefits conviction . . . to render the entire [forfeiture]

19

statute meaningless"]; accord, *Woods v. City of* Lawton, *supra*, 845 P.2d 880, 883; *Public Emp. Retirement System v. Dodd* (W.Va. 1990) 396 S.E.2d 725, 731; *Garay v. Dept. of Management Services* (Fla.Dist.Ct.App. 2010) 46 So.3d 1227, 1228.)

To sum up:  a public employee who has submitted application for retirement, and who is no longer actually working, is in a state of limbo until the application is approved by the retirement board. It is only with that approval that the employee[11] can be considered "a retired member" for purposes of CERL.  On January 1, 2013, when the Pension Reform Act and section 7522.72 took effect, Wilmot's application had been submitted but not yet approved by CCERA.  Because Wilmot did not become officially retired until April 2013, he was subject to the new forfeiture provision.

Wilmot's position that he is being "divested" of his vested pension benefits is built on two assumptions.  The first is that he was "retired" when he sent in his pension application and no longer went to work.  The preceding discussion has established that this initial conclusion is faulty as a matter of statutory construction.[12]

---

[11]   A fetish should not be made of the precise terminology of status:  As we have noted, a person who stops going to the office may well consider herself a former employee.  Whether one is an "active" employee, a "legacy" employee, a former employee, or an about-to-be-retired employee is essentially immaterial. The only relevant status, the one that is used by CERL, is whether one is or is not a "retired member," and CERL is explicit on how that status is acquired.

[12]   At the end of his opening brief, Wilmot argues that Judge Treat "improperly excluded relevant evidence showing that section 7522.72 was intended to apply solely to current public employees' on PEPRA's operative date."  "We apply the abuse of discretion standard in reviewing a trial court's ruling denying a request for judicial notice (i.e., we affirm the ruling unless the information . . . was so persuasive that no reasonable judge would have denied the request for judicial notice)."  *(CREED-21 v. City of San Diego*

20

The second assumption is that pension benefits, whenever acquired during the course of employment, thereupon become "vested," by which Wilmot means fixed and generally not subject to alteration without violating two provisions of our state constitution. As previously noted, we had already rejected a largely identical claim in *Marin County*.

Our Supreme Court has repeatedly held that anticipated pension benefits are subject to " 'reasonable modifications and changes *before the pension becomes payable* and that until that time the employee does not have a right to any fixed or definite benefits . . . .' " *(Miller v. State of California* (1977) 18 Cal.3d 808, 816 [emphasis added], quoting *Wallace, supra,* 42 Cal.2d 180, 183; accord, e.g., *Betts v. Board of Administration* (1978) 21 Cal.3d 859, 863; *Packer v. Board of Retirement* (1953) 35 Cal.2d 212, 218; *Kern v. City of Long Beach* (1947) 29 Cal.2d 8 48, 854–855; cf. *Terry v. City of Berkeley* (1953) 41 Cal.2d 698, 702 [citing *Packer* as "authority for the proposition that reasonable changes detrimental to [a public employee] may be made" up to the time "the pension [is] due and payable"].) " 'The right to a pension is a vested right; the amount of the pension may not always be ascertained until the last contingency has occurred.' " (*Dickey v. Retirement Bd. Of S.F.* (1976) 16 Cal.3d 745, 750, fn. 3, quoting *Brooks v. Pension Board* (1938) 30 Cal.App.2d 118, 123; cf. *Carr v. Fire Commission of San Francisco* (1938) 30 Cal.App.2d 208, 211 ["A pension law may be changed or modified so long as the vital contingency has not happened upon which an employee may

(2015) 234 Cal.App.4th 488, 520.) Wilmot makes no genuine effort to disprove Judge Treat's ruling that the proffered "documents do not purport to say anything one way or the other as to the question at issue here—the applicability of PEPRA's felony forfeiture provisions to pre-enactment retirees." The documents are therefore not so persuasive on that issue that any reasonable judge would have granted Wilmot's request.

predicate his right to a pension"].)  Approval by the retirement board is among the last contingencies.

We now revisit the issue in light of our Supreme Court's decision in *Alameda County*.  We will also address another constitutional claim advanced by Wilmot that we found initially unnecessary to resolve—that application of section 7522.72 to him would be a violation of the California Constitution's prohibition against ex post fact laws.

## Constitutional Analysis

"A[n] . . . ex post facto law, or law impairing the obligation of contracts may not be passed."  (Cal. Const., art. I, § 9.)  Wilmot invokes both of these clauses.  Pursuant to the Supreme Court's directive, we begin with the contract claim.

## The Contract Clause Claim

Wilmot's belief that he was actually retired before section 7522.72 took effect is the foundation of his contention that he is the victim of an unconstitutional attempt to reduce his pension.  Although the preceding statutory analysis has proved otherwise, this does not harm his position.  For purposes of the following analysis, we shall treat him as fully retired on January 1, 2013, when the Pension Reform took effect.  As a separate and independent ground for our decision (see *Bank of Italy Nat. Trust & Sav. Assn. v. Bentley* (1933) 217 Cal. 644, 650), we conclude application of section 7522.72 to a retired employee is not prohibited by the Contract Clause of the California Constitution.

The analytical matrix was spelled out in *Alameda County*.

First, the court determines whether the legislative change of the status quo imposes "an economic disadvantage on affected employees and, if so,

whether those disadvantages are offset in some manner by comparable new advantages." (*Alameda County*, *supra*, 9 Cal.5th 1032, 1082, 1092.)

Second, the court "must then determine whether the government's articulated purpose in making the changes [is] sufficient, for constitutional purposes, to justify any impairment of pension rights." (*Alameda County*, *supra*, 9 Cal.5th 1032, 1082.) Constitutionally, "modifications of public pension plans are permissible only if they relate to the operation of the plan and are intended to improve its functioning or adjust to changing conditions." (*Id*. at p. 1094.) Stated in other terms, " 'alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation.' " (*Ibid*.)

Third, even if the changes were made for a proper purpose, "[t]he Legislature's decision to impose financial disadvantages on public employees without providing comparable advantages will be upheld under the contract clause only if providing comparable advantages would undermine, or would otherwise be inconsistent with, the modification's constitutionally permissible purpose." (*Alameda County*, *supra*, 9 Cal.5th 1032, 1093.)

The first step is quickly resolved, for there is no dispute that section 7522.72 diminished county employees' pension rights in that no longer could an employee commit job-related felonies and face no adverse financial consequence. The Pension Reform Act did not include any compensatory or comparable advantage. The State does not attempt to argue otherwise.[13]

---

[13] CCERA declined to address the constitutionality of section 7522.72, believing this was an issue beyond its jurisdiction. (See Cal. Const., art. III, § 3.5, subd. (a) [administrative agencies have no power "[t]o declare a statute unenforceable, or refuse to enforce a statute, on the basis of it being unconstitutional"].)

23

The second step has already been largely addressed by our Supreme Court in *Alameda County*.

In general, the Pension Reform Act was enacted for the purpose "of closing loopholes and preventing abuse of the pension system in a manner consistent with CERL's preexisting structure." (*Alameda County*, *supra*, 9 Cal.5th 1032, 1054, 1102 ["the Legislature was attempting to reduce manipulation"].) The specific provision examined there was a provision in the Pension Reform Act that narrowed the definition of "compensation earnable" (§ 31461), a key factor in calculating an employee's pension benefits, to combat the practice of "pension spiking"—the manipulation of pattern of work time and pay to produce an artificially inflated compensation earnable during the final compensation period used to calculate an employee's pension. (*Alameda County*, *supra*, at pp. 1061, 1098.) The state of affairs before the Pension Reform Act redefinition allowed "distorting the pension calculation and increasing pension benefits beyond the amount anticipated by the underlying theory of compensation earnable." (*Id.* at p. 1096.)

"The purpose of PEPRA's amendment of section 31461 . . . was to bring administrative practice . . . into closer alignment with the system's underlying theory by excluding income designed to artificially inflate a pension." (*Alameda County*, *supra*, 9 Cal.5th 1032, 1102.) This, the court held, was a legitimate motivation: "A legislative intent to align the express language of a pension statute more closely with its intended manner of functioning directly relates to both the theory of a pension system and its successful operation."[14] (*Id.* at p. 1095.)

---

[14] In its discussion of a municipal pension system, the *MacIntyre* court stated: " '[I]t would be an absurd construction of the language creating it to hold that the intention of the Legislature was to give a life annuity to persons

24

Pension forfeiture provisions have a number of rationales that dovetail with "the theory of a pension system." The leading commentary identifies four: (1) because "pensions are a reward for faithful service," "the corrupt public servant is not entitled to a public pension"; (2) "pension forfeiture is 'just deserts' for breach of the public trust" and " 'the public's right to conscientious service from those in government' " (quoting *Kerner v. State Employees Retirement Sys.*, *supra*, 382 N.E.2d 243, 246); (3) forfeiture "deters public corruption" and "will discourage official malfeasance"; and (4) "forfeiture has symbolic importance" because "public outrage and cynicism . . . greet the revelation that a wrongdoer will receive his pension despite his wrongdoing." (*Pension Forfeiture*, *supra*, 35 Am.Crim.L.Rev. 57, 76–79.)

The only decision from our Supreme Court considering a pension forfeiture does not discuss when it is proper, but only when it is not.

In *Wallace, supra,* 42 Cal.2d 180, a retired chief of police had his pension payments stopped when he was convicted of a federal crime committed after his retirement. The forfeiture provision was added after Wallace entered the police department, but long before he retired. In a relatively brief opinion, the Supreme Court concluded the termination of Wallace's pension was invalid.

"No case in this state has passed upon the specific question of the reasonableness of an amendment, made before an employee is eligible to retire, which provides for termination of pension rights if he is convicted of a

---

who, on their merits, as distinguished from mere time of service, might be dismissed . . . for misbehavior.' " (*MacIntyre*, *supra*, 42 Cal.App.2d 734, 736.) It is a reasonable inference that section 7522.72 was enacted because the Legislature discovered that the feared absurdity had come to pass and ought to be stopped.

felony after retirement. In order to determine this question we must look to the general principles set forth in the *Kern* [*v. City of Long Beach, supra,* 29 Cal.2d 848] and *Packer* [*v. Board of Retirement, supra,* 35 Cal.2d 212] cases where it was pointed out that a city may make reasonable modifications of pensions, prior to retirement, for the purpose of keeping the pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system and carry out its beneficent policy. [Citations.] We must also keep in mind the facts that pension payments are deferred compensation to which a pensioner becomes entitled upon performing all services required under the contract and that his retirement because of age ordinarily shows that he has done everything necessary to entitle him to payment of the pension. [Citations.]

"Application of these principles in the present case leads to the conclusion that the amendment does not constitute a reasonable modification as to Wallace. The termination of all pension rights upon conviction of a felony after retirement does not appear to have any material relation to the theory of the pension system or to its successful operation. Rather, the change was designed to benefit the city and, as stated in the city's brief, to meet the objections of taxpayers who would be opposed to contributing funds for the maintenance of a pensioner who had been convicted of a felony. At the time of the amendment, Wallace had obtained substantial rights by reason of his services, and the amendment in effect operated as a condition subsequent to terminate a pension which he had fully earned. A city has no more right to adopt an amendment which does not come within the purposes of the rule permitting modifications than a private insurance carrier would have to change an annuity policy by making a unilateral amendment under which the insured's interest might be terminated upon his conviction of a

26

felony." *(Wallace, supra,* 42 Cal.2d 180, 184–185; see *id.* at p. 183 ["a public pension system is subject to the implied qualification that the governing body may make reasonable modifications and changes *before the pension becomes payable*," italics added].)

The *Wallace* court was not clear as to whether the decisive factor was (a) that a complete forfeiture of pension rights was not a "reasonable modification" or (b) the forfeiture language could not reach a person who was actually and formally retired. Likely it was both. (See *Skaggs v. City of Los Angeles* (1954) 43 Cal.2d 497, 503 [*Wallace* "held that the amendment constituted an unreasonable impairment of plaintiff's contract with the city and could not operate to deprive him of his pension rights upon his conviction of a felony some three years after he retired"]; cf. *Kern v. City of Long Beach*, *supra*, 29 Cal.2d 848, 853 [pension system modification "does not [allow] that an employee may be deprived of *all* pension benefits" "no decision has been found holding that an employee's pension rights may be *entirely* destroyed," italics added].)[15]

In *Alameda County* the Supreme Court indicated that appeasing public opinion, a proffered defense in *Wallace*, was an "essentially political reason" that is not a permissible purpose in modifying a pension system. (*Alameda County*, *supra*, 9 Cal.5th 1032, 1094–1095.) From this, Wilmot argues that section 7522.72 was *not* enacted for a constitutionally permissible purpose, that is, "a valid justification for changing a pension system 'must relate to considerations internal to the pension system.' " (*Alameda County*, *supra*, 9 Cal.5th 1032, 1098, quoting *Claypool v. Wilson* (1992) 4 Cal.App.4th 646,

---

[15] Wilmot's reliance on *Skaggs* is misplaced for the simple reason that the employee there was ultimately *acquitted* of the service-related criminal charge. (*Skaggs v. City of Los Angeles*, *supra*, 43 Cal.2d 497, 499.)

666.)  Rather, he argues, he is being punished for a political reason external to the effective operation of CERL, namely, the Legislature's attempt to assuage public outrage at a convicted felon collecting a taxpayer-funded pension.  Wilmot insists the impropriety of this motivation is established by what the Supreme Court said in *Alameda County* about the earlier *Wallace* opinion.

Thus, Wilmot contends, with considerable earnestness and cogency: "This constitutionally impermissible purpose is made clear by the disparate impact Section 7522.72 has on Wilmot, relative to the harm caused by his conduct.  Wilmot's employer suffered damages in the amount of $32,966.36.  Wilmot has made the District whole by paying that amount as restitution.  Wilmot has also served 88 days of home detention, and was placed on formal probation for five years. . . .  [¶]  The application of section 7522.72, however, has imposed a financial forfeiture of tens of thousands of dollars per year for the rest of his life.  Using CCERA's calculations, Wilmot will forfeit over $70,000 each year, which in a single year is more than double the total financial harm suffered by the District.  The application of Section 7522.72 imposes a grossly disproportionate financial penalty that has absolutely no relation to the harm caused."  (Bolding and underscoring omitted.)

It is true, as already shown, that "public outrage . . . that a wrongdoer will receive his pension despite his wrongdoing" (*Pension Forfeiture*, *supra*, 35 Am.Crim.L.Rev. 57, 79) is one of the traditional justifications for the forfeiture principle.  It is also true that in *Wallace* the attempt to forfeit the retiree's entire pension was rebuffed because it did "not appear to have any material relation to the theory of the pension system."  (*Wallace*, *supra*, 42 Cal.2d 180, 185.)  Referring to *Wallace*, the court in *Alameda County* discounted public outrage as an "essentially political reason" that was not a

28

permissible or "proper purpose," and thus was insufficient to justify the forfeiture. (*Alameda County*, *supra*, 9 Cal.5th 1032, 1093–1094.) Another justification, that pension forfeiture is "just desert" for breach of the public trust, sounds like punishment, a point Wilmot also develops in his ex post facto argument.

Wilmot lays repeated emphasis on the idea that pension benefits are a form of deferred compensation for services performed. It is this concept that caused the Supreme Court to "hold them protected under the contract clause." (*Alameda County*, *supra*, 9 Cal.5th 1032, 1077.) Yet the rule is subject to a major proviso.

In the very same decision that first extended constitutional protection, the court cautioned: "The rule permitting modification of pensions is a necessary one since pension systems must be kept flexible to permit adjustments in accord with changing conditions . . . . [¶] Thus it appears . . . that an employee may acquire a vested contractual right to a pension but that this right is not rigidly fixed by the specific terms of the legislation in effect during any particular period in which he serves." (*Kern v. City of Long Beach*, *supra*, 29 Cal.2d 848, 854–855.) This point was reiterated in *Wallace*, when the court went on to say: "We must also keep in mind the facts that pension payments are deferred compensation to which a pensioner becomes entitled upon performing all services required under the contract and that his retirement . . . *ordinarily* shows that he has done everything necessary to entitle him to payment of the pension." (*Wallace*, *supra*, 42 Cal.2d 180, 184–185, italics added.) "[A] public pension system is subject to the implied qualification that the governing body may make reasonable modifications and changes before the pension becomes payable and that until that time the employee does not have a right to any fixed or definite benefits but only to a

substantial or reasonable pension." (*Id.* at p. 183.)  This thinking was prominent in *Alameda County* and in *Marin County*.  (See *Alameda County*, *supra*, 9 Cal.5th 1032, 1078–1080; *Marin County*, *supra*, 2 Cal.App.5th 674, 706–707.)

The ultimate question is whether a modification of a pension is reasonableness, in terms of the parties' expectations and the measure's necessity, in serving an important public purpose.  (See *Alameda County*, *supra*, 9 Cal.5th 1032, 1075–1077, 1089, 1100; *Allen v. City of Long Beach* (1955) 45 Cal.2d 128, 131 ["modifications must be reasonable"]; *Wallace*, *supra*, 42 Cal.2d 180, 183–184 [courts must "determine whether the changes made come with the bounds of a reasonable modification"].)

Because state-wide forfeiture provisions are a fairly recent feature of pension schemes, we looked first at the plain language of section 7522.72, but there is nothing showing a declared purpose.  Our examination of the legislative history found nothing providing an express motivation for the forfeiture provision.  There are references to "abusive practices," which are invariably mentioned as "pension spiking" and "double-dipping,"[16] but we

---

[16]   The following language was repeated many times:

" 'California's public pension systems were established to provide retirement security for those who give their lives in public service.  Recently, the benefits provided by those systems have been tainted by a few individuals who have taken advantage of the system.  This is in part due to the '37 Act's very broad and general definition of "compensation earnable" (the amount of which a member's pension is calculated).  In these counties some public employees, most of them in upper-level positions, have taken advantage of this situation to include items in their compensation that "spike" their final compensation to create vastly increased pension checks for themselves.'

" 'The abusive practices engaged in by a few individuals have put retirement benefits at risk for the vast majority of honest, hard-working public servants.  Additionally, the practice of having someone retire on Friday and come back to work on Monday and being able to collect a full

found no express intent behind section 7522.72. There is only one reported decision on it. Nevertheless, like the court in *Hipsher v. Los Angeles County Employees Retirement Assn.* (2020) 58 Cal.App.5th 671 (*Hipsher*), we have no difficulty in discerning the point of the law.

To judge from earlier opinions, the most frequently expressed sentiment was that "one of the primary objectives in providing pensions to public employees . . . is to induce competent persons enter and remain in public employment" during which they will render " 'long-continued and faithful service.' " *(Kern v. City of Long Beach*, *supra*, 29 Cal.2d 848, 856, 852; see *Carman v. Alvord* (1982) 31 Cal.3d 318, 325, fn. 4 ["Pensions . . . help induce faithful service"]; *Lix v. Edwards* (1978) 82 Cal.App.3d 573, 578 ["Pension plans . . . induce continued faithful service by the employee"]; *McCarthy v. City of Oakland* (1943) 60 Cal.App.2d 546, 550 ["Many of the pension laws in this state are based primarily upon the rule that rewards will be given for faithful performance of future services"]; *Klench v. Board of Pension Fd, Commrs.* (1926) 79 Cal.App. 171, 190 [speaking of persons "retired from a public service to which they devoted many years of faithful service"]; cf. *Hayward v. American Fire River Protection Dist.* (1998)

retirement benefit along with a full paycheck, is something the public simply will not tolerate any longer. Allowing this 'double-dipping' to continue only adds to the growing public concern over the pension being received by public employees.'

" 'This measure will address these abusive practices by giving the '37 Act retirement boards the authority and the obligation to deny compensation items that are provided to an employee for the principal purpose of enhancing a member's retirement, specifically excluding certain payments from the definition of 'compensation earnable,' and requiring an employee to 'sit out' for 180 days after retirement before returning to service.' " (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 340, (2011–2012 Reg. Sess.), as amended Sept. 2, 2011, p. 6.)

67 Cal.App.4th 1292, 1296, 1304 ["faithful performance of duty"]; *MacIntyre*, *supra*, 42 Cal.App.2d 734, 736 ["it is an implied condition of employment, and hence a condition of [the vesting of pension rights] that the duties of the employee shall have been faithfully employed"].)

Withholding that inducement if the employee's performance is not faithful is an entirely logical response. An employee who draws public pay while stealing public property, or embezzling public funds, or who uses public facilities or equipment to run an illegal business (which is what occurred in *Hipsher*), is the antithesis of a "faithful" servant of the public trust. When misconduct turns into outright criminality, it is beyond dispute that public service is not being faithfully performed. To give such a person a pension would further reward misconduct. This state of affairs clearly amounted to a "loophole" that the Legislature moved to close because it "distort[ed] the pension calculation." (*Alameda County*, *supra*, 9 Cal.5th 1032, 1054, 1096.) Although section 7522.72 might be thought to be a departure from CERL's "preexisting structure" in that there was no prior provision for forfeiting an employee's pension rights or benefits, the removal of this loophole would clearly "align [CERL] . . . more closely with its intended functioning." (*Id*. at pp. 1054, 1095.) Like pension spiking, discouraging felonious conduct on the job qualifies as a measure aimed at "preventing abuse of the pension system." (*Alameda County*, *supra*, 9 Cal.5th 1032, 1054.)

"Experience with the implementation of a statutory pension system will inevitably reveal the need for change to close loopholes and foreclose opportunities for abuse." (*Alameda County*, *supra*, 9 Cal.5th 1032, 1103.) By enacting section 7522.72, the Legislative moved to close an egregious loophole that allowed public funds to reward criminality.

The third and final step of the analysis is to examine whether section 7522.72 can satisfy this test: "The Legislature's decision to impose financial disadvantages on public employees without providing comparable advantages will be upheld under the contract clause only if providing comparable advantages would undermine, or would other otherwise be inconsistent with the modification's constitutionally permissible purpose." (*Alameda County*, *supra*, 9 Cal.5th 1032 at p. 1093.) Our task is not difficult.

As already mentioned, the Pension Reform Act was enacted for the purpose "of closing loopholes and preventing abuse of the pension system in a manner consistent with CERL's preexisting structure" and to "align [CERL] . . . more closely with its intended functioning." (*Alameda County*, *supra*, 9 Cal.5th 1032 at pp. 1054, 1095.) "Although public employee pension plans may be modified 'for the purpose of keeping [the] pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system,' to survive contract clause scrutiny such changes 'must bear some material relation to the theory of a pension system and its successful operation.' " (*Id*. at p. 1093.)

The matter of job-related misconduct was deemed sufficiently wide-spread to be included in the Little Hoover Commission Report and the Governor's pension reform proposal to the Legislature. It has already been established that the Pension Reform Act had a constitutionally permissible purpose, and collecting public pay for criminality certainly qualifies an abuse or loophole that the Legislature could end. Although it was not positively expressed before the Pension Reform Act, the prohibition on publicly-financed criminality would make a correction by restricting pension benefits to those employees who do not betray the public trust. Such would be "consistent with CERL's preexisting structure" of impliedly rewarding only faithful

33

service (see *MacIntyre*, *supra*, 42 Cal.App.2d 734, 736), and would thus "align [it] . . . more closely with its intended functioning." (*Alameda County*, *supra*, 9 Cal.5th 1032, 1054, 1095.) Calling a halt to having the public pay for job-related criminality unquestionably "bear[s] some material relation to the theory of a pension system and its successful operation.' " (*Id*. at pp. 1093–1094.) Thus, the enactment of section 7522.72 does " 'relate to considerations internal to the pension system.' " (*MacIntyre*, at p. 1098)

We have been unable to imagine how the Legislature could have provided "comparable new advantages to offset" this particular disadvantageous modification because to do so "would undermine [and would] . . . be inconsistent with[] the constitutionally permissible purpose underlying the modification." (*Alameda County*, *supra*, 9 Cal.5th 1032, 1099.) Put bluntly, why should the Legislature be required to come up with another way to reward criminality by public employees? Why should the Legislature be prevented from attacking public employee criminality unless it came up with another way for job-related crimes to be paid for with public money? Why should the Legislature have to compensate public employees not to commit crimes? With eloquent understatement, the *Hipsher* court concluded that accepting Wilmot's reasoning would "yield perverse results," "would do nothing to disincentivize the very abuse the [Pension Reform Act] is intended to curb, . . . would erode public trust," and "would be antithetical to the statute's purpose by unjustly enriching a malfeasant . . . employee for engaging in the very sort of abusive e practices section 7522.72 is intended to curb." (*Hipsher*, *supra*, 57 Cal.App.5th 671.)

With minimal change, language from the Supreme Court closes the matter: "It would be anomalous, at best, to hold that the Constitution requires current employees to be provided an equivalent advantage to

34

mitigate the effect of [pension forfeiture] that, in the view of the Legislature, are inconsistent with the theory underlying the pension system. Requiring comparable advantages would be wholly inconsistent with the Legislature's purpose by restoring some form of advantages that, in the view of the Legislature, should not have been available to county employees in the first place." (*Alameda County*, *supra*, 9 Cal.5th 1032, 1102.)

" 'The party asserting a contract clause claim has the burden of "mak[ing] out a clear case, free from all reasonable ambiguity," [that] a constitutional violation occurred. [Citation.]' [Citation.]" (*Marin County*, *supra*, 2 Cal.App.5th 674, 703.) Wilmot has not done so. Just as the Supreme Court concluded with pension spiking, so do we with limited pension forfeiture: "the PEPRA amendment did not violate the contract clause of our Constitution, notwithstanding the failure of the Legislature to provide new features to offset the financial disadvantages of the PEPRA amendment." (*Alameda County*, *supra*, 9 Cal.5th 1032, 1054, 1101–1102)

## The Ex Post Facto Claim

Wilmot also contends that if section 7522.72 is applied to reduce his pension benefits, such will amount to an ex post facto law. His argument hinges on the belief that the statute subjects him to greater punishment. He is mistaken.

"Although the Latin term 'ex post facto' literally extends to any statute passed ' "after the fact" ' [citation], 'no statute falls within the ex post facto prohibition unless "two critical elements" exist.' [Citation.] The statute must be retroactive, and must implicate at least one of the four categories described in *Calder v. Bull* (1798) 3 U.S. (3 Dall.) 386, 390. [Citation.] To be considered retroactive, the law must ' "change[] the legal consequences of an act completed before [the law's] effective date," namely the defendant's

35

criminal behavior.' [Citations.] 'In other words, the operative event for retroactivity purposes, and the necessary reference point for any ex post facto analysis, is criminal conduct committed before the disputed law took effect.' [Citation.] As to the second element, the four *Calder* categories encompass laws that (1) criminalize conduct that was innocent when done; (2) aggravate or make greater a crime than when committed; (3) change and increase the punishment; and (4) alter the rules of evidence to reduce the legal sufficiency necessary to support a finding of guilt. [Citations.]" (*People v. Trujeque* (2015) 61 Cal.4th 227, 256.

For present purposes, we shall assume—as we did with Wilmot's other constitutional claim—that he was well and truly retired when section 7522.72 took effect. Thus, he satisfied the first of the "critical elements," that section 7522.72 is retroactive.

As for the second element, he focuses on the third of the four *Calder* categories. Wilmot argues that although section 7522.72 is "not facially penal," requiring him to "forfeit his retirement rights and benefits based on [his] conviction serves no purpose, but to increase his punishment for the same crime." He reasons: "Forcing Wilmot to forfeit his pension benefits as well as for the same offense does not make the public or the District more whole for harms caused by his conduct. There are no uncompensated victims or ongoing harm that can be remedied by Wilmot losing his pension benefits. Any harm that Wilmot caused to the District does not extend to CCERA or its pension system's ability and obligation to provide Wilmot with his earned and funded pension benefit. PEPRA's felony forfeiture provisions do not require a nexus between the pension benefits disgorged and the economic harm caused by the criminal conduct, nor is it designed to reimburse the retirement

36

system for any harm caused to it.  Section 7522.72 has no remedial purpose—it is designed to punish."

Wilmot's attitude is understandable.  Many years ago, Presiding Justice Peters observed:  "Every civil sanction, such as forfeiture . . . , can be considered in various ways.  Obviously, so far as the wrongdoer is concerned, such a sanction, in a very real sense, is an additional punishment to that provided by the penal laws."  (*People v. One 1950 Cadillac 2-Door Club Coupe* (1955) 133 Cal.App.2d 311, 317–318.)  But the relevant legal analysis is hardly so simple.

The immediate difficulty is that "punishment" has no single meaning, but draws meaning of the particular context.  "Commonly understood definitions of punishment are intuitive . . . .  [P]unishment has historically included a variety of methods limited only by human imagination, yet in situations going beyond traditional notions of punishment intuition alone does not provide adequate guidance."  (*People v. McVickers* (1992) 4 Cal.4th 81, 84.)

Our Supreme Court recently explored the complexity of the concept: " '[T]he traditional aims of punishment' are 'retribution or deterrence.' [Citation.]  However, a sanction does not constitute punishment merely because it has some 'deterrent or retributive *effect*.'  [Citation.]  As we have explained in the context of applying the state and federal protections against cruel and/or unusual punishment, 'a sanction designed and intended only to serve legitimate nonpenal objectives is not punishment . . . simply because it may burden inconvenience, restrict, or deter *in fact*.'  [Citation.]  On the other hand, that a given sanction may 'serve[] remedial purposes,' does not establish that it is not 'punishment.'  [Citations.]  In short, because 'sanctions frequently serve more than one purpose' [citation] and have multiple effects,

determining whether a given sanction constitutes 'punishment' is often difficult." (*People v. Ruiz* (2018) 4 Cal.5th 1100, 1107–1108.)

The courts employ a two-stage analysis.

"[1] Whether a particular punishment is criminal or civil is, at least initially, a matter of statutory construction. [Citation.] A court must first ask whether the legislature, 'in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other.' [Citation.] [2] Even in those cases where the legislature 'has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect,' [citation], as to transform what was clearly intended as a civil remedy into a criminal penalty,' [citation].

"In making this latter determination, the factors listed in *Kennedy v. Mendoza–Martinez,* [(1963)] 372 U.S. 144, 168–169 . . . , provide useful guideposts, including:  (1) '[w]hether the sanction involves an affirmative disability or restraint'; (2) 'whether it has historically been regarded as a punishment'; (3) 'whether it comes into play only on a finding of *scienter*'; (4) 'whether its operation will promote the traditional aims of punishment— retribution and deterrence'; (5) 'whether the behavior to which it applies is already a crime'; (6) 'whether an alternative purpose to which it may rationally be connected is assignable for it'; and (7) 'whether it appears excessive in relation to the alternative purpose assigned.'  It is important to note, however, that 'these factors must be considered in relation to the statute on its face,' *id.,* at 169, and 'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty, *Hudson v. United States* (1997) 522 U.S. 93, 99–100 [monetary penalty not violative of double jeopardy]; accord, *Smith v.*

38

*Doe* (2003) 538 U.S. 84, 92 [*Hudson* analysis used for ex post facto claim]; *United States v. Ward* (1980) 448 U.S. 242, 248–249 [analysis used for civil penalty claim].)[17]

We are fortunate in the first stage of analysis because the Legislature made it very clear how it viewed the sanction established by section 7522.72. It may not mean much, but the provision is in the Government Code, not the Penal Code. (See *People v. McVickers, supra*, 4 Cal.4th 81, 88; *Smith v. Doe, supra*, 538 U.S. 84, 94, 108 (conc. opn. of Souter, J.).) What is far more significant is that, in employing the concept of forfeiture, the Legislature adopted a measure that has a considerable history and body of law behind it. And civil forfeiture is unambiguously—and almost universally classified as— not a criminal penalty.

Civil forfeitures were authorized by one of the earliest statutes enacted by the first Congress. (See *Calero-Toldeo v. Pearson Yacht Leasing Co.* (1974) 416 U.S. 663, 683.) From the perspective of almost 150 years, Justice Brandeis would summarize: "Forfeiture of goods or their value and the payment of fixed or variable sums of money are other sanctions which have been recognized as enforceable by civil proceedings since the original revenue law of 1789. [Citation.] In spite of their comparative severity, such sanctions have been upheld against the contention that they are essentially criminal and subject to the procedural rules governing criminal prosecutions."

---

[17] Our Supreme Court has held that the California ex post facto provision is to be "analyzed identically" with its federal counterpart (*People v. McVickers, supra*, 4 Cal.4th 81, 84), and decisions of the United States Supreme Court are routinely cited in California decisions construing the state provision. California also follows the two-stage approach. (See, e.g., *People v. Hanson* (2000) 23 Cal.4th 355, 361–362; *People v. Castellanos* (1999) 21 Cal.4th 785, 795 [plur. opn.], 801–802 [conc. opn. of Kennard J., quoting *Hudson*]; *People v. Wallace* (2004) 120 Cal.App.4th 867, 874–875.)

(*Helvering v. Mitchell* (1938) 303 U.S. 391, 400.)  In 1877 the court would simply state "the remedy of forfeiture . . . is plainly one of a civil nature." (*Dobbins's Distillery v. United States* (1877) 96 U.S. 395, 399.)

The issue in *Helvering v. Mitchell, supra,* 303 U.S. 391 was the 1928 enactment adding a familiar feature of federal tax law—the 50 percent penalty for unreported income "due to fraud with intent to evade tax." Proceeding from the proposition that "Congress may impose both a criminal and a civil sanction in respect to the same act or omission" (*id*. at pp. 398–399), Justice Brandeis explained why imposition of sanction was not punishment in the criminal, constitutional sense:

"The fact that the Revenue Act of 1928 contains two separate and distinct provisions imposing sanctions, and that these appear in different parts of the statute, helps to make clear the character of that here invoked. The sanction of fine and imprisonment prescribed by section 146(b) for willful attempts 'in any manner to evade or defeat any (income) tax,' introduced into the Act under the heading 'Penalties,' is obviously a criminal one.  The sanction of 50 per centum addition 'if any part of any deficiency is due to fraud with intent to evade tax,' prescribed by section 293(b), introduced into the Act under the heading 'Additions to the tax,' was clearly intended as a civil one.  This sanction, and other additions to the tax are set forth in Supplement M, entitled 'Interest and Additions to the Tax.'  The supplement includes, besides section 293(b), sections 291, 292, 293(a), and 294 [26 U.S.C.A. §§ 291, 292, 293(a), 294.]  Section 291 prescribes a 25 per centum addition for failure to make and file a return; section 292 prescribes interest at the rate of 6 per centum per annum upon the deficiency from the date prescribed for payment of the tax; section 293(a), an addition of 5 per centum if the deficiency 'is due to negligence, or intentional disregard of rules

and regulations but without intent to defraud'; and section 294 prescribes an addition to the tax of 1 per centum per month in case of non-payment. Obviously, all of these 'Additions to the Tax' were intended by Congress as civil incidents of the assessment and collection of the income tax." (*Helvering v. Mitchell*, *supra*, 303 U.S. 391, 404–405, fns. omitted.)

"That Congress provided a distinctly civil procedure for the collection of the additional 50 per centum indicates clearly that it intended a civil, not a criminal, sanction.  Civil procedure is incompatible with the accepted rules and constitutional guaranties governing the trial of criminal prosecutions, and where civil procedure is prescribed for the enforcement of remedial sanctions, those rules and guaranties do not apply.  Thus the determination of the facts upon which liability is based may be by an administrative agency instead of a jury . . . and . . . in the civil enforcement of a remedial sanction there can be no double jeopardy."  (*Helvering v. Mitchell*, *supra*, 303 U.S. 391, 402, fns. omitted.)

Ex post facto analysis looks to punishment.  So does double jeopardy analysis.  In *United States v. Ursery* (1996) 518 U.S. 267, the United States Supreme Court surveyed the history of in rem forfeiture[18] actions, and reiterated that they were civil in nature, not criminal, and did not violate double jeopardy even after acquittal on the criminal charge.  The test

---

[18]  "Traditionally, forfeiture was an action against the tainted property itself and thus proceeded *in rem*; that is, proceedings in which '[t]he thing [was] primarily considered as the offender, or rather the offence [was] attached primarily to the thing.' [Citation.]  The forfeiture 'proceeding *in rem* st[ood] independent of, and wholly unaffected by any criminal proceeding *in personam'* against the defendant."  (*Honeycutt v. United States* (2017) ___ U.S. ___ [137 S. Ct. 1626, 1634–1635.)  Although this was never a true in rem action, the name does convey the essence of this dispute—a fight over property, specifically, a portion of Wilmot's pension.

employed to resolve the civil versus criminal issue had two parts: (1) Congressional intent, which the court concluded, showed that forfeiture was intended " 'as a remedial civil sanction," and (2) " ' "whether the statutory scheme was so punitive either in purpose or effect as to negate" Congress's intention to establish a civil remedial mechanism,' " the answer to which was no. (*Id*. at pp. 277–278.) Thus, even when connected to a criminal proceeding, forfeiture was not punishment for a criminal act. (See *id*. at p. 292 ["though [forfeitures] are tied to criminal activity, . . . this fact is insufficient to render the statutes punitive"].) Moreover, the court noted, civil forfeitures, "while perhaps having certain punitive aspects, serve important nonpunitive goals." (*Id*. at p. 290.) One such goal is deterrence, and "we long have held that this purpose may serve civil as well as criminal goals." (*Id*. at p. 292, citing *Bennis v. Michigan* (1996) 516 U.S. 442, 452 ["forfeiture . . . serves a deterrent purpose distinct from any punitive purpose"].)

California law is generally in accord. (See, e.g., *People v. Nazem* (1996) 51 Cal.App.4th 1225 [holding drug-related forfeiture law not penal according to *Ursery*]; *People v. Shanndoah* (1996) 49 Cal.App.4th 1187 [same]; *People v. One 1950 Cadillac 2-Door Club Coupe*, *supra*, 133 Cal.App.2d 311, 318.) Although deterrence may be intended, it does not neutralize or outweigh a nonpunitive purpose. (*Hudson v. United States*, *supra*, 522 U.S. 93, 105 [deterrence as purpose "is insufficient to render a sanction criminal, as deterrence 'may serve civil as well as criminal goals' "]; *People v. Nazem*, *supra*, at pp. 1232–1233 ["forfeiture serves the nonpunitive purpose of discouraging property owners from using or allowing the use of their property in illegal activity"].) While "all civil penalties have some deterrent effect"

(*Hudson v. United States*, *supra*, 522 U.S. 93 at p. 102), it does not follow that "all deterrence is penal in nature." (*In re Alva* (2004) 33 Cal.4th 254, 288.)

We think it self-evident that section 7522.72 was meant to have the deterrent effect of preventing job-related criminality out of fear of losing pension benefits. A classic definition of forfeiture is a "divestiture . . . because of a . . . *breach of obligation, or neglect of duty*." (Black's Law Dict. (11th ed. 2009) p. 792, col. 2, italics added; accord, 36 Am.Jur.2d (2011) Forfeitures and Penalties, §§ 1, 3, pp. 500, 502; cf. *County of San Diego v. Milotz* (1956) 46 Cal.2d 761, 766 [" 'Forfeiture' imports a 'penalty' . . . '. . . for a default or wrong' "].) California accepts and applies this definition tying forfeiture to " ' "misconduct or breach of duty." ' " (*Warner v. Public Employees' Retirement System* (2015) 239 Cal.App.4th 659, 669, quoting *Kuhlemeier v. Lack* (1942) 50 Cal.App.2d 802, 808.) It is a long-standing statutory principle of law in this state that relief against forfeiture may be granted "except in case of a grossly negligent, willful, or fraudulent breach of duty." (Civ. Code, § 3275; see *Gonzalez v. Hirose* (1948) 33 Cal.2d 213, 217 ["courts may grant relief against a forfeiture in the absence of a breach of duty"].) Rewarding only faithful public service is an important nonpunitive goal.

One of the goals of forfeiture is to make criminal activity unprofitable. (36 Am.Jur.2d , *supra*, Forfeitures and Penalties, §§ 1, 14, pp. 500, 510; Health & Saf. Code, § 11469, subd. (j) ["civil forfeiture is intended to be remedial by removing the tools and profits from those engaged in the illicit drug trade"].) This appears to have been what Judge Treat had in mind when he cited *MacIntyre* in support of his conclusion that "what PEPRA accomplishes is to take back from Wilmot what he never rightfully earned in

43

the first place-namely pension rights for a period when he was violating his trust as an employee by embezzling from his employer."[19]

As the *MacIntyre* court put it: "It is assumed that upon acceptance of a position as an officer or employee of a governmental agency, an appointee will perform his duties conscientiously and faithfully. . . . [E]fficiency and fidelity in the performance of duty are . . . paramount considerations. It is never contemplated that an officer or employee guilty of conduct warranting dismissal should continue in office or be permitted to receive other emoluments offered as an inducement to honesty and efficiency. The right to a pension is not indefeasible, and an employee, though otherwise entitled thereto, may not be guilty of misconduct in his position and maintain his rights notwithstanding such dereliction of duty." (*MacIntyre*, *supra*, 42 Cal.App.2d 734, 735.)

We conclude the Legislature intended the forfeiture mandated by section 7522.72 to be a remedial civil measure. Wilmot points to nothing suggesting the Legislature meant this kind of forfeiture to depart from the historical understanding that it was not a punitive measure.

Now we "consider whether the proceedings are so punitive in fact as to 'persuade us that the forfeiture proceeding may not legitimately be viewed as

---

[19] This also appears to be the view of the Attorney General: "By committing a felony in connection with his job as a county firefighter, [Wilmot] did not uphold his duties under the contract [of employment], and was therefore not entitled to receive the corresponding pension benefits. . . . The pension penalty is closely calibrated to the failure to perform faithful service. [¶] By associating the amount of pension forfeited with the time period in which a pensioner engaged in criminal conduct, the Legislature ensured that the pension benefit remains a reward for faithful service. . . . [¶] Section 7522.72 merely enforces the contract terms providing for the pension benefit, and ensures that [public employees] provide the consideration of faithful service."

civil in nature,' despite [the Legislature's] intent." (*United States v. Ursery, supra*, 518 U.S. 267, 288.) This too is not difficult. As already noted, section 7522.72 is not draconian. It does not call for the loss of all pension benefits. It is triggered only by felonies that are job-related. The employee's contributions are not kept, but are returned to the employee. Thus, section 7522.72 has three particulars where the Legislature restrained its forfeiture power, and did not display "a thirst for revenge." (*People v. McVickers, supra*, 4 Cal.4th 81, 89.) If real punishment was intended, it was an opportunity missed.

As for the seven *Mendoza-Martinez* factors, only two—forfeiture comes into play only upon a finding of scienter, and the behavior to which it applies is already a crime—break in Wilmot's favor.[20] The latter factor is of small significance. (See *United States v. Ursery, supra*, 518 U.S. 267, 278 ["By itself . . . the fact that the behavior proscribed by the forfeiture was already a crime [is] insufficient to turn the forfeiture into a punishment"]; *Murphy v. United States* (1926) 272 U.S. 630, 632 ["The mere fact that it [a forfeiture,] is

---

[20] The Attorney General contests the first factor, arguing that "section 7522.72 does not require that CCERA make a finding of scienter before reducing an employee's pension." (Cf. *United States v. Ursery, supra*, 518 U.S. 267, 291 ["there is no requirement in the statutes . . . that the Government demonstrate scienter in order to establish that the property is subject to forfeiture"].) It is true that a pension-administering body is not required to make an independent finding of scienter but it does not have to because the finding of scienter has already been furnished by the employee's job-related felony conviction, at which point the pension-administering body commences the near-ministerial administrative process specified in section 7522.72. (Cf. *People v. 25651 Minoa Dr., supra*, 2 Cal.App.4th 787, 796 ["under [Health & Saf. Code] section 11470 a criminal conviction . . . is not a prerequisite to forfeiture, so there is no question of scienter in the forfeiture action"].)

imposed in consequence of a crime is not conclusive"].)  These factors are clearly outweighed by those supporting a nonpunitive determination.

Forfeiture entails no affirmative disability or restraint, i.e., a restriction on personal liberty; as already shown, forfeitures have historically not been viewed as punishment.  Section 7522.72 was not enacted as a stand-alone statute.  Instead, it was part of a comprehensive measure fundamentally altering the basis on which pensions for a large number of public employees will be calculated and paid-out.  The Pension Reform Act was enacted for the purpose "of closing loopholes and preventing abuse of the pension system in a manner consistent with CERL's preexisting structure" and to "align [CERL] . . . more closely with its intended functioning." (*Alameda County*, *supra*, 9 Cal.5th 1032, 1054, 1095.)  As we have determined in connection with Wilmot's contract impairment claim, discouraging felonious conduct on the job qualifies as a measure aimed at "preventing abuse of the pension system." (*Alameda County*, *supra*, 9 Cal.5th 1032, 1054.)  Rewarding only faithful public service is an important nonpunitive purpose.  Although there is an element of deterrence, there is a clear purpose other than punishment for section 7522.72, one which does serve a legitimate nonpunitive end.  "The Act's rational connection to a nonpunitive purpose is a 'most significant' factor in our determination that the statute's effects are not punitive." (*Smith v. Doe*, *supra*, 538 U.S. 84, 102.)

We have repeatedly emphasized the ways in which the statute could have been far more harsh in application and we thus conclude that the limited forfeiture called for by section 7522.72 does not appear excessive in relation to its nonpunitive purposes.

Moreover, section 7522.72 provides for forfeiture through an administrative agency, hardly a characteristic of a criminal procedure. (See *United States v. One Assortment of 89 Firearms*, *supra*, 465 U.S. 354, 363 [governing statute "authorizes a summary administrative proceeding" which the court termed a "distinctly civil procedure"]; *Helvering v. Mitchell*, *supra*, 303 U.S. 391, 402; *People v. Nazem*, *supra*, 51 Cal.App.4th 1225, 1231; cf. *Smith v. Doe*, *supra*, 538 U.S. 84, 96 ["The Act itself does not require the procedures adopted to contain any safeguards associated with the criminal process. That leads us to infer that the legislature envisioned the Act's implementation to be civil and administrative"].) Indeed, the United States Supreme Court stated that giving the exaction authority to an administrative agency "is prima facie evidence that Congress intended to provide for a civil sanction." (*Hudson v. United States*, *supra*, 522 U.S. 93, 103.) Finally, proof beyond a reasonable doubt is not required.

Although Wilmot lays much stress on the financial hardship he will endure, such is irrelevant to our inquiry, "as we look only to 'the statute on its face.'" (*Hudson v. United States*, *supra*, 522 U.S. 93, 104, quoting *Kennedy v. Mendoza-Martinez*, *supra*, 372 U.S. 144, 169.) Proportionality has never been a consideration. Solicit an act of prostitution from your car, and you may lose the car. (Veh. Code, § 22659.5.) Violate the California Uniform Controlled Substances Act, and you risk losing your car, real property, or business, as well as "[a]ll moneys, negotiable instruments, securities, or other things of value . . . , all proceeds traceable [that] is . . . used or intended to be used to facilitate any violation . . . ." (Health & Saf. Code, § 11470, subds. (e), (f), & (g).) Lie about how much whiskey is being produced at your distillery, and the Government can take the distillery. (*Dobbins's Distillery v. United States*, *supra*, 96 U.S. 395.) As Justice Brandeis put it, the severity of a

47

forfeiture's application has no impact on its established legality. (See *Helvering v. Mitchell, supra*, 303 U.S. 391, 400.)

Our research uncovered a United States Supreme Court decision of unusual relevance. In *Flemming v. Nestor* (1960) 363 U.S. 603, the court considered whether a person could be denied Social Security benefits following deportation. A bare majority held, over powerful dissents, that the statute authorizing the denial did not subject the deportee to punishment and thus there was no ex post facto violation. Although the interest there was called an "accrued property right," the similarity to Wilmot's claimed "vested pension rights" is too obvious to require comment.

To prevail, Wilmot is required to bring forth " 'the clearest proof ' " to demonstrate that what has traditionally been accepted as a civil remedy has been transmuted into an ex post facto criminal penalty *People v. Alford* (2007) 42 Cal.4th 749, 755; *Coats v. New Haven Unified School Dist.* (2020) 46 Cal.App.5th 415, 425.) He has failed to carry that burden.

## Conclusions and Disposition

In summary, we conclude as a matter of statutory construction that Wilmot was not "retired" for purposes of CERL when he submitted his application for retirement benefits on December 13, 2012. And as a separate and independent ground for our decision, we also conclude that if Wilmot was retired on January 1, 2013, the date the Pension Reform Act took effect, the partial forfeiture of his pension benefits pursuant to section 7522.72 did not violate either the impairment of contract or the ex post facto clauses of the California Constitution.

The judgment is affirmed.

_____
Richman, Acting P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.

*Wilmot v. Contra Costa County Employees' Retirement Assn.* (A152100)

49

| | |
|---|---|
| Trial Court: | Contra Costa County Superior Court |
| Trial Judge: | Honorable Charles S. Treat |
| Attorney for Plaintiff and Appellant Jon Wilmot: | Rains Lucia Stern St. Phalle & Silver PC, Timothy K. Talbot, Zachery A. Lopes. |
| Attorney for Defendant and Respondent Contra Costa County Employees' Retirement Association: | Reed Smith LLP, Harvey L. Liederman, May-tak Chin. |
| Attorney for Intervener State of California: | Xavier Becerra, Attorney General of California, Thomas S. Patterson, Senior Assistant Attorney General, Benjamin M. Glickman, Supervising Deputy Attorney General, Anna T. Ferrari, Deputy Attorney General, Anthony P. O'Brien, Deputy Attorney General |